## TAR & FUEL TRANSPORT CORPORATION v. PALMER et al.

### THE AUTHENTIC.

#### No. 380.

Circuit Court of Appeals, Second Circuit.

June 7, 1937.

Lynch, Hagen & Atkins, of New York City (Henry C. Eidenbach and Charles W. Hagen, both of New York City, of counsel), for appellant.

Duncan & Mount, of New York City (C. R. Millett and H. W. Dieck, Jr., both of New York City, of counsel), for trustees of the New York, New Haven & Hartford R. Co.

William J. Mahar, of New York City, for libelant.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by the steamtug "Authentic," from a decree in the admiralty, holding her solely at fault for a collision in Hell Gate in the early morning of February 3, 1936. The tug, "Transfer No. 20," with a carfloat on either hand, was west bound in the East River, and the "Authentic" with a barge on her right hand was east bound. The collision occurred just west of the Triborough Bridge in Hell Gate. The tide was flood, full strength, and there was much ice in the river. Both boats were navigating in accordance with the custom in Hell Gate on the flood, which we accepted as proper in The Transfer No. 21, 248 F. 459, and which requires a west bound vessel to leave

the right hand side of the channel at Negro Point, to cross the tide and to make for Hallett's Point, getting the benefit of an eddy which makes into Pot Cove. She must then cross the tide again, and get back to the right side of the channel, about opposite the Astoria Ferry. Conversely, an east bound vessel must cross the tide to reach the left side of the channel between Mill Rock and Hallett's Point, and make for Negro Point, which she must keep close aboard as she passes, for otherwise the tide coming in between Hog Back and Mill Rock and making strong towards the Astoria shore, will carry her over on to the Scaly Rocks. The judge found that the "Transfer" left the right side of the channel at Negro Point, crossed the tide, and headed for Hallett's Point, but that, not having sufficient power to hold her own against ice and current, she slowly drifted back toward the Astoria shore. He also found that the "Authentic" instead of shaping her course close to Negro Point, allowed herself to be carried into the right half of the channel, so that the collision happened, as we have said, not far west of the Astoria end of the Triborough Bridge. Both vessels backed for some moments before collision; the "Authentic" swinging to the left and the "Transfer" to the right, until her left hand float collided with the right side of the "Authentic's" barge. He held the "Authentic" at fault for being out of position, and absolved the "Transfer." Both tugs agree that the injured barge is entitled to recover from one or the other of them, or from both. The "Authentic" appealed.

The finding that the collision took place near the Astoria shore, east of Pot Cove, is conclusive of the case. The sterns of the "Transfer's" floats were only about seventy feet from shore; and their bows extended not more than four hundred feet into the channel. At its narrowest it is three hundred yards wide, so that the whole of the tow was on the proper side. The "Authentic" had entered the "Transfer's" water, and was out of position; that was a fault, and the most important, if not the only, cause of the collision. It is apparent that the "Authentic's" proctors recognized the importance of this question, for in their pleading they placed the collision near Mill Rock, and charged as the "Transfer's" principal fault that she had not observed the custom, and had come over to the right side of the channel. The

judge particularly commented upon the credibility of the "Transfer's" master, and we should in any case have accepted his finding upon such a controverted question of fact.

Some uncertainty exists about the "Transfer's" navigation. The "Authentic's" master swore that he gave an alarm upon seeing her shut out her green, and open her red, light; and that he followed this by a two-blast signal which she answered. That too is the version given in the pleading. The "Transfer" apparently did not hear this alarm, and, as the judge found only that the two blast signals were exchanged, we must take it that if the alarm was given, it was not heard, and that the "Transfer" was right in supposing that the situation was safe for a right to right passing. That the "Transfer" should have showed her red light before the exchange of signals is highly improbable. True, she was not able to make head against the ice and tide, but she was travelling through the water and therefore had steerage way, and could keep her heading as well as though she were travelling forward over the land. We should therefore be antecedently disposed to believe that her change of heading took place only after she began to back, and that the "Authentic's" story of seeing the red light before the exchange, was made up ad hoc. The judge's finding as to this is not as definite as we could wish, but we understand it to be as we have said, and, as that was the "Transfer's" story, and as in general he believed her master, we accept it. If so, her navigation was proper after the vessels began to manœuvre with regard to each other.

It is also asserted that the "Transfer" was at fault for being too heavily burdened for the tide and the ice. It is quite true that a tug which takes on more than she can handle in the conditions she is to meet, is at fault; but to make her liable the fault must have some part in the result. As we said in The Transfer No. 21, supra, the mere fact that a tug is held up by tide and weather in Hell Gate, will not charge her, if she performs all her duties; that is, if she keeps on the proper side of the channel and heads along the thread of the stream. It can make no difference to vessels bound in an opposite direction that she does not move over the land; they must not enter her water. Nor can we see

that the "Transfer" was at fault, though drifting backwards, for answering the passing signal. The Rules control, and the right to right passing rule obtained, for the vessels were "approaching each other," (article 18, rule 1, section 203, title 33, U. S.Code [33 U.S.C.A. § 203]), though the tide added to the movement over the land of one, and reduced that of the other to a minus quantity. What else than answer the signal she should have done, we cannot understand; surely it would have been improper for her to blow a backing signal, for that would have meant that her engines were "going full speed astern." (Pilot Rules, "Signals".)

Decree affirmed.