MARTIN MARINE TRANSP. CO., Inc., v. JAKOBSON & PETERSON, Inc.

No. 178.

Circuit Court of Appeals, Second Circuit.

April 1, 1943.

---

326

Paul Speer, and Macklin, Brown, Lena-han & Speer, all of New York City, for appellant.

Christopher E. Heckman, Foley & Martin, and James A. Martin, all of New York City, for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The Martin Marine Transportation Company, Inc., appeals from a decree in the admiralty which dismissed its claim against Jakobson & Peterson, Inc., filed in a proceeding to limit any liability of that company arising out of a collision between a barge in tow of its tug and a barge in tow of the claimant's tug, near Negro Point in Hell Gate, on the night of December 18, 1940. The important facts, as found by the judge and in the main not disputed, are as follows: The claimant's tug, "Mars," was bound west against a flood tide of about three miles, with the light barges, "Manor," and "Winsor," in tow on her port and starboard hand respectively. She carried regulation towing lights, and there was a green light on the starboard side of the "Winsor," and a red light on the port side of the "Manor". The petitioner's tug "Republic," was bound east with a loaded barge on her port side; she also displayed proper lights. When near the upper end of Welfare Island, the "Republic" sounded the Hell Gate signal, as the "Mars" did when she was somewhat east of the Railroad Bridge; neither tug heard the other. The captain of the "Mars" could not see over the bow of the "Manor" on his port side, and for that reason he had stationed his second mate as a look-out on the bow of that vessel. From that position the mate made out the "Republic" and her tow, when the bow of the "Manor" was under the Railroad Bridge, but did not report it. Shortly thereafter the "Mars's" master caught a glimpse of the "Republic" when the "Mars" had herself not passed, but was still under, the Railroad Bridge, and the "Republic" had not yet reached Negro Point. He at once blew a single blast, reduced to half speed from a speed of 4¾ to 5 knots per hour over the ground (7¾ to 8 knots through the water), and put his rudder right. This manoeuvre caused the "Manor" to shut out the "Republic" from the master's view and he did not see her or her tow again until after the collision. As soon as the "Republic's" master heard the whistle of the "Mars" he blew three blasts and reversed, because, as he swore, he at once

realized that he could not keep on the left side of the channel for as long a time as was necessary for his safety, if the "Mars" kept under way, as she was doing. Shortly after the "Republic" had so reversed, the tide caught her stern and swung her bow toward the Wards Island shore, which she had expected would happen, for she passed Negro Point close aboard. Seeing this sheer, the "Mars's" look-out called upon her master to reverse, but he did not hear, and did nothing. The place of collision was in dispute: the witnesses for the "Mars" put it at a point nearly midway between the bridges and close over upon the Wards Island shore; those for the "Republic" put it at a point about 300 feet east of the Triborough Bridge and about 500 feet east south-east from Negro Point. The judge accepted the version of the "Republic's" witnesses. The collision was between the bluff of the port bows of the "Manor" and the "Republic's" barge at a very narrow angle. The force of the blow broke the "Manor" adrift, and the "Mars" and the "Winsor" went ashore at a point on Wards Island about 600 feet from Negro Point.

The "Mars" complained that the "Republic" rounded Negro Point at full speed too close to the shore, took a sheer to port and allowed the "Mars" too narrow a berth to pass port to port as the vessels should have done. The "Republic" complained that the "Mars" did not hang back far enough east of Negro Point, after she had made out the "Republic," to give the "Republic" room to round the Point. She called witnesses to prove that it was the custom for a west-bound vessel meeting an east-bound vessel on the flood, to lie a substantial distance east from the Point; some said half way between the bridges; some, at the Railroad Bridge itself. The purpose of this is to give the east-bound vessel enough water at once to round Negro Point close and to avoid the danger of being carried over to the Astoria shore, and also to correct the sheer which is almost inevitable unless the vessel gives the Point a wider berth. The "Mars's" witnesses disputed this custom; they agreed that the west-bound vessel was by custom obliged to keep just east of Negro Point, but no more; and they said that the east-bound vessel should give Negro Point a berth of 400 feet or thereabouts so as not to sheer. They believed that she could keep so far away without danger of being carried upon the Astoria shore. The judge accepted the testimony of the "Republic's" witnesses, and there was no apparent reason why he should not have done so.

■ It is impossible rigidly to fix the proper berth which a vessel should give Negro Point in rounding it on a flood tide. There is, on the one hand, the unquestioned danger of going aground at Astoria and, on the other, the probability, if not certainty, of being twisted to port as the bow gets into slacker water than the stern. Just what distance to select as the proper compromise in such dangerous water must be in good measure left to the master's decision. It is true that before the Inspectors the master of the "Republic" said that he had given the Point a berth of 200 feet; but we think that the shorter distance must be the right one, both because the "Republic" certainly did sheer, and because we place the collision nearer to the Wards Island shore than the judge did. The last we do for the following reasons. Arguendo, we shall assume that the "Winsor" went ashore on Wards Island at the spot where the "Mars" says she did. That does not mean that the "Republic" pushed her ashore, however; it is entirely possible that the "Winsor" and the "Mars" drifted back some distance on the tide after their way was killed, and that in the excitement of the collision they did not observe that they were drifting towards the shore. At night it was obviously impossible to fix the place of collision with any approach to accuracy, but we cannot accept the point marked "C" on the chart because if the vessels had collided there, the tide would certainly not have carried the "Winsor" and the "Mars" to Wards Island, but probably to Astoria. This change in position makes no difference in the result; the only important fact was that the "Mars" did not hold back far enough east of Negro Point to give the "Republic" room to right herself from the sheer and to pass the "Mars" port to port as she intended, and as her witnesses said she had to do for safety.

■ We can see no reason for saying that such a custom is unreasonable, considering the difficulties which confront a vessel at that place with the tide underfoot. That does not mean that we are laying down a rule of navigation; nor should our decision be so taken. All we say is that on this record it was not "clearly erroneous" to find that such a custom existed, and that if it did, it was valid. When we decide that a custom has been proved, it is never a prec-

edent; on other testimony the same judge might find that the custom did not exist; on the same testimony another judge might find that it did not; we should affirm each without the least inconsistency. A rule of navigation is different; an official with proper authority, having weighed the conflicting interests at stake, fixes an accommodation between them which he deems right, and attaches his sanction to it; his fiat makes it imperative. We can do nothing of the sort; we can only determine whether there is a custom, and then approve or disapprove it.

 Moreover, in the case at bar we hold the "Mars" at fault, not only for failing to follow the custom but for an insufficient look-out. Except for the second mate on the "Manor's" bow she was running blind, and when the time came, the look-out was unable to make himself heard from where he stood. As a result she was utterly without eyes for several minutes before the collision. If tugs will tow barges which block off a sector of their field of vision, they are absolutely charged with providing an adequate substitute. Moreover, the absence of a look-out casts upon a vessel the same burden as the violation of a statutory rule. The Ariadne, 13 Wall. 475, 479, 20 L.Ed. 542; The Madison, 2 Cir., 250 F. 850. It is impossible to say beyond reasonable doubt that if the "Mars" had reversed at once on getting the "Republic's" signal, there would have been a collision.

The "Republic" was not proved at fault. She was entitled to assume that the "Mars" would do her duty by giving her room to swing around the Point and correct the sheer which she could not avoid. We will not say that it might not have been wiser for her to give the Point a wider berth; but that does not mean that she was at fault for failing to do so. We have already said why a master should be given a wide latitude of choice, especially when it is so easy for a vessel breasting the tide to hold back far enough until he passes. It is true that some vacillation appears in the evidence as to what course the "Republic" actually had in mind—whether a starboard to starboard, or a port to port passing. From the petition (Article Sixth) it is fairly plain that the person who drafted it supposed that the "Mars" was on the south side of the channel and by her turn to starboard balked what would have been, and should have been, a starboard to starboard passing. At the trial the "Republic's"

master took a different position; he said that the reason why he backed and blew an alarm when he got the "Mars's" single blast was because she was coming on instead of hanging back as she should have done, and—as we infer—that this would thwart, not a starboard to starboard passing, but the course which he proposed to himself: to cross the thread of the channel when passing under the Railroad Bridge and pass the "Mars" port to port. In spite of the pleading whose form may have been due merely to the proctor who drew it, there does not seem to us to be anything inherently improbable in this testimony. Anything which signified to the "Republic's" master that the vessels must pass further to the west than he had expected, was a sign of danger. He could not safely go off to starboard, and he could not pass starboard to starboard. At least we are not so well satisfied of his fault that we will charge him with it, while the "Mars's" fault in running blind was flagrant.

 The objection that the "Republic" was violating the narrow channel rule needs no consideration. We have repeatedly held, for example, that west of Negro Point the duties of the vessels are the complete opposite to what the rule prescribes. Tar & Fuel Transportation Corporation v. Palmer, 2 Cir., 90 F.2d 437. By its very terms the rule is limited to situations where adherence is "safe and practicable"; and we had supposed that it was by now understood by everyone that, when a custom has developed which requires a departure from it for mutual safety, it is in abeyance. We find that the "Mars" was at fault and the "Republic" was not at fault.

 The final question concerns costs, as to which we do not agree with the court below. We held in The W. A. Sherman, 2 Cir., 167 F. 976, 977,—a decision frequently cited since it was decided—that in a limitation proceeding the petitioner pays the "expenses he has incurred for the purpose of availing himself of the act of Congress." These include, we said, the "cost of filing petition, and stipulations for costs and value, premium, if any, for stipulations, expense of appraisal or of bill of sale transferring the vessel, commissioner's report on appraisal, expert fees, etc." All these the petitioner must pay, whether or not the claimant contests his right to limit, and even though the petitioner wins when the claimant has done so. If the claimant does contest the right and loses he must

of course pay any expenses occasioned by the contest, but that does not relieve the petitioner of the initial expenses of setting up the limitation proceeding. Again, if the claimant loses on the merits of his claim, he must of course pay any expenses so imposed upon the petitioner. In the case at bar the claimant did dispute the right to limit and thereby became liable for any expenses to which it put the petitioner by so doing. It was also liable for the petitioner's expenses occasioned by the contest on the merits. But no part of the petitioner's expenses for initiating the limitation proceeding were on the claimant's account; these the issue taken by the claimant's answer did not shift. The decree will therefore be modified by reversing the award of costs and remanding the cause to the district court to retax the costs in accordance with the foregoing.

We cannot see that Admiralty Rule 7, 28 U.S.C.A. § 723, or the amendment of 1936, to § 185 of Title 46, U.S.C.A., makes any difference. The Rule merely included premiums among taxable disbursements, and added nothing to the existing practice in this circuit; the amendment circumscribed the privilege, but did not make it any less a privilege which the owner must pay for, if he is not content to rely upon limitation as a defense.

Decree affirmed except as to costs, as to which it is reversed.