JAMES McWILLIAMS BLUE LINE, Inc., v. THE PROSPECT II

THE BLUE JACKET.

THE PROSPECT II

No. A–17123.

District Court, E. D. New York.

April 30, 1945.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelant.

Purdy & Lamb, of New York City (Edmund F. Lamb, of New York City, of counsel), for claimant.

BYERS, District Judge.

There was a collision on January 10, 1944, in the Arthur Kill, about a half mile south of Tremley Point on the New Jersey side. The libelant's wooden barge Blue Jacket, being loaded and the hawser vessel in a two-barge tow to the libelant's tug Republic No. 5 that was proceeding up the Kill, favoring the Staten Island side, and when about abreast of the mouth of the Rahway River, was struck by the steel barge Cape Clarence, which was light and being towed, stern foremost, by the Diesel tug Prospect II, which had the barge on the tug's port hand; the stern of the tug was about 10 feet aft of the rear end of the barge.

There is no criticism of the make-up of either tow, nor are the material facts in dispute.

The collision occurred at about 2:45 p. m., and there was an ebb tide flowing down the Kill, and the wind was blowing out of the northwest, of an average hourly force of about 22 miles.

There were two barges, both loaded, in the upbound tow, which means that the freeboard of those vessels was low. It will be seen that this tow was affected only by the tide, while the Cape Clarence, being light, had the tide underfoot, and was receiving the force of the wind on her high side nearest the Staten Island shore. Also that the captain of the Prospect II had to navigate without being able to observe anything except what he could see dead ahead and to his starboard side, since his entire view to port was shut off; this means that he had to rely on navigating signals from the deckhand on the Cape Clarence.

The vessels came into mutual sight as the downbound tow rounded Tremley Point, and Loud, the mate on the Republic No. 5, who was in charge of navigation, at once blew a one-blast signal to indicate a port passing, and he did not hear an acceptance, although all witnesses called for the Prospect II assert that the signal was accepted by a one-blast whistle signal.

The channel is about 375 feet wide, and there was ample room for these tows to pass safely, and the Cape Clarence passed the Republic No. 5 with a clearance of

about 20 feet, but her course was then toward the New Jersey shore, for the Prospect II was under a starboard helm at that time, which caused the after end of the Cape Clarence to approach so close to the Blue Jacket as to strike the latter near her port bow; that is to say, between the bow cleat and the quarter cleat on the port side forward, causing the damage in suit.

The Findings are:

(1) Ownership and operation of all vessels involved were conceded and are found to be in accordance with the pleadings.

(2) The libelant's Diesel tug Republic No. 5 (87 feet by 20.1 feet by 9.9 feet inside depth, with 500 horse power) was proceeding in a northerly direction through Arthur Kill on January 10, 1944, having in tandem tow the libelant's wooden barge Blue Jacket, loaded (116.3 feet by 31.2 feet by 13.4 feet inside depth) and drawing 11½ feet of water, and close coupled, libelant's wooden barge Blue Comet (112 feet by 29 feet by 14.8 feet inside depth), drawing 11½ feet of water, also loaded, on a bridle hawser about 200 feet long, leaving a space between the tug and the hawser barge of about 180 feet. This tow moved at a speed of 2½ miles per hour over the ground.

(3) The claimant's Diesel tug Prospect II (63.5 feet by 18.8 feet by 8 feet inside depth, with 375 horse power) was proceeding in a southerly direction through the Arthur Kill at the same time, having on her port side the steel barge Cape Clarence, which was light, stern first (133.9 feet by 34 feet by 15.5 feet inside depth). This tow, being light, and having the tide underfoot, made 4½ miles per hour over the ground.

(4) As the latter tow was made up, the navigator of its tug was unable to see except directly ahead from his pilot-house and on his starboard side, since the cabin on the Cape Clarence rises 8 feet above the deck and is 22 feet wide and measures 8 feet fore and aft, and the coaming is 4.9 feet above the deck; the height of the sides of the Cape Clarence at the stern was 18.6 feet, which was increased by the 8-foot height of the cabin; the height of the sides amidships was 17 feet, and the Cape Clarence drew 20 inches when light.

(5) The top of the pilot-house of the Prospect II was not more than 15½ feet above the water-line.

(6) The stem of the tug Prospect II was about 80 feet aft of the forward end of the Cape Clarence as the latter was being towed.

(7) There was an ebb tide running southerly through Arthur Kill, and a northwest wind prevailed, of an average hourly force of 22 miles; visibility was good, and the temperature was about 34° Fahrenheit.

(8) No other navigation affected either tow.

(9) As the southbound tow rounded Tremley Point it was observed by the navigator of the Republic No. 5 when his tug was about a half mile below that place, and he at once blew a one-whistle signal to indicate a port passing.

(10) That signal was accepted by the Prospect II which also blew a one-whistle signal, which was not heard, however, on the Republic No. 5.

(11) Both tows were navigated upon the understanding that they were to pass port to port.

(12) No further signals were exchanged between the towing vessels, nor was an alarm blown by either.

(13) When about off the mouth of the Rahway River the after corner of the Cape Clarence, as she was being towed, struck the port side of the Blue Jacket.

(14) Both barges in the upbound tow at the time of the collision were somewhat westerly of the center line of the channel; that is to say, they tended to favor the Staten Island side, by reason in part of the force of the tide running out of the Rahway River, which tended to set on the Staten Island side of the Kill.

(15) The descending tow did not continue to navigate in accordance with her own acceptance of a port to port passing.

## Conclusion

The libelant is entitled to the usual decree appointing a Commissioner to assess damages.

It will be seen that these tows, once having come into mutual sight, were traveling at a combined speed of about seven miles an hour, which means that not to exceed 4½ minutes elapsed between the one-whistle signal blown by the Republic No. 5, and the collision; this interval apparently afforded the descending tow too little time for her navigator to correctly

calculate the effect of the northwest wind upon the high sides of the Cape Clarence, which tended to hold her off from the New Jersey shore.

The testimony is convincing that Jensen, who was acting as deckhand on the Cape Clarence, undertook to direct the navigation of the tow from the forward end of his vessel throughout the trip which had started that morning at 96th Street and East River, and which was to end at South Amboy; he had held a license since 1937, and seemed to be a responsible person; off Tremley Point, when he was in his cabin, he observed the ascending tow and at once went out to the deck and made appropriate signals to Olsen, the captain of his towing vessel, to indicate a one-whistle signal, which Olsen blew; and then a right turn, which Olsen executed. Jensen expected a starboard passing because the upbound tow was bucking the tide, but he promptly adjusted himself to a port passing by directing the acceptance of the one-whistle signal.

As the tows approached, Jensen again signaled for a right rudder, and that was obeyed, but soon the tows were so close that Jensen realized that a left rudder was necessary in order to throw the stern of the Cape Clarence closer to the New Jersey shore, and he gave such a signal, which was also obeyed, but by then it was too late to avoid the contact to which reference has been made.

The tows continued on their respective ways, and it should be noted that Loud, the navigator of the Republic No. 5, said that the Cape Clarence not only struck the Blue Jacket but also the bridle with such force that, after the ascending tow had proceeded about four miles, the hawser parted at the bridle.

The fault to be attributed to the Prospect II lay in making too wide a turn at Tremley Point to enable her tow to carry out the port passing, and perhaps this is to be explained by Jensen's early expectation that there would be a starboard passing.

Loud, the navigator of the Republic No. 5, is to be criticised for not having repeated his one-blast signal when he says he received no answer from the Prospect II, and perhaps for not blowing an alarm; but that fault cannot be said to have contributed to the collision, since Jensen's testimony makes it clear that, once the port passing was accepted, the descending tow navigated upon that agreement, and therefore a repetition of the one-blast would not have emphasized the understanding which Jensen already possessed when he directed Olsen to accept the initial one-blast signal.

It is obvious that the risk of navigating a tow consisting of such a light steel barge as this, and made up so that the master of the tug has only half or less of a field of vision, is a heavy one, and entails such a responsibility as can be discharged only by the most careful and alert attention of those in control. Cf. Martin Marine Transp. Co., Inc., v. Jakobson & Peterson, Inc. (The Republic No. 5), 2 Cir., 135 F.2d 325.

The offending tug relies mainly upon the argument that when the tows came into mutual sight the ascending one must have been inclining closer to the New Jersey side than her testimony discloses, since it is customary for such a tow to thus avoid the full effect of the ebb tide; if that be granted, then it is argued that she was not in her own side of the channel when the collision occurred, and fault must be attributed to the towing vessel Republic No. 5 for that result.

I do not so appraise the testimony. It is true that the collision should never have taken place, for there was ample space in which to effect a port passing. Also it may be true that the Republic No. 5 was not as close to the Staten Island side of the fairway as possible, and I doubt if Buoy No. 6 was much out of position, if at all, when this collision took place. However, the evidence is persuasive that the upbound tow at the time of the collision was completely in her own side of the channel, which means that contact would not have occurred if the same were true of the Prospect II and her tow.

Usual decree for libelant to be settled.