## THE GRACE R.

## THE MARTIN KEHOE.

### RICE v. UNITED STATES.

#### No. A-17355.

District Court, E. D. New York.

June 5, 1946.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libellant.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Leo J. Curren, of New York City, of counsel), for respondent.

Purdy & Lamb, of New York City (Edmund Lamb, of New York City, of counsel), for claimant.

GALSTON, District Judge.

The scow Grace R was damaged on January 10, 1945. She had been taken in tow by the tug S. T. 56 at Pier 19, Staten Island, bound for Pier 13, Staten Island. The scow was towed bow first on the tug's port side. Shortly after leaving Pier 19 and while proceeding about one thousand feet off the pier ends, the port side of the scow came into collision with a tow in charge of the tug Martin Kehoe. At the time of the collision, the Kehoe's tow was between the tow of the S. T. 56 and the pier ends. The libellant charges both tugs with fault.

After the libellant had proved damage, the captain of the S. T. 56 was called by the Government. He explained that he had picked up the barge at Pier 19 at 12:35 A. M. on January 10, 1945. It had been lying at the pier end of Pier 19, Staten Island. The scow projected forward of the stem of the tug. His job was merely to shift the scow to the south side of Pier 13. On letting out into the stream, he made his turn on a wide course until he was about a thousand feet off shore, and then proceeded parallel with the pier ends. On approaching the vicinity of Pier 16, and while on that course, his deckhand reported that there was a tug coming down from that slip. The deckhand was stationed on the port side, midships of the barge. The barge was loaded with Army combat tanks. At that time, i. e. when the deckhand made the report of the approaching tow, Byrne, the captain of the S. T. 56, heard a one whistle blast. He did not answer the one whistle signal, as he contended there was no reason for his doing so, but proceeded on his course, keeping his speed and interpreting the signal as one indicating that the other tow would pass under his stern. Momentarily thereafter he heard another whistle and saw his deckhand back away from the mid-

ships bitt and cry out that the on-coming tow was going to hit the scow. Byrne put his wheel hard to the right, but presently felt an impact. The starboard corner of the barge in tow of the Martin Kehoe had collided with the Grace R. Byrne said that he was carrying two vertical lights on his mast, red and green running lights, and a white light forward. The scow had been made fast to the Grace R with a line leading from the tug's forward bitt to the middle bitt of the scow, and another line from the side bitt of the tug to the scow's middle bitt; and also a stern line from the tug to the scow's stern line.

There is a question raised in the case in respect to the failure of the' scow to carry a light. Apparently scowmen leave the boats when berthed in the piers at about 5 P. M. Byrne said it had not been his practice to direct a deckhand to put a light on scows shifted around the piers.

Byrne admitted that with the loaded barge in tow on the port side, he was not able to see across the scow from his pilot house. Apparently he was more concerned in operating along the pier ends, with railroad tows and other vessels to starboard. On his northerly course then his view of the pier ends was partly blocked.

Forsythe, the captain of the tug Kehoe, explained that he had a flat Army barge in tow, length from ninety to a hundred feet, and beam twenty to twenty-five feet. The barge was loaded with cases that ranged in height from six to eight feet, and had been lying on the north side of Pier 16 about one hundred fifty feet in from the end of the pier. The Martin Kehoe is seventy-six feet in length with a beam of twenty feet. Her deckhouse is built on the main deck, about seven and a half feet in height, and her pilothouse is on the deck, raised to a height of about ten feet. The Army barge was taken on the starboard side of the tug. The stem of the tug extended about twelve feet beyond the bow of the barge. There was an open space of about eight feet between the forward cases and the end of the barge, and the end of the barge was about even with the wheelhouse or pilothouse. As to lights, one light was placed on the forward end of the starboard side of the barge, and another on the starboard stern corner. To complete the picture around Pier 16, it appears that there were barges lying at the end of that pier, eight or ten in number. As Forsythe proceeded out of the slip, he blew a slip whistle. Having regard to the stage of the ebb tide and its set, he headed into the tide in a northerly direction, at some angle to Pier 16. Apparently the last stage of the ebb tide sets heavily on the Staten Island piers, and as he proceeded, his course carried him into the tide. The barge was on the starboard side to hold the tow in the tide without giving the boat too much wheel. He was bound for Pier 19. As he cleared the barges off Pier 16 he noticed a light off Pier 17, just one white light, and he could not make out what it was. However, he knew it was proceeding towards him. Later it proved to be a loaded scow. He was not able to see any running lights on the towboat. When he first saw the light he stopped his boat, blew one whistle, intending to go under the stern of the other vessel. With the tide setting in on the piers, the S. T. tow came towards him, and he then blew an alarm whistle and put his boat in reverse. The collision followed, the starboard bow corner of the Kehoe's scow coming in contact about mid-ships with the Grace R.

The libellant is, of course, entitled to a decree for the damage to the Grace R. The only possible contributing fault alleged is that she carried no light, but in the circumstances she was relieved of that responsibility if it existed by the practice at the Staten Island piers during war time, as well as by the obligation, if any, of the S. T. 56 to have put a light on her.

The survey of the whole situation indicates a number of contributing factors. First in respect of the Kehoe, she had no lookout. As to the S. T. 56, her scow was unlighted, and undoubtedly there was an obligation to carry lights. 33 U.S. C.A. §§ 171, 172, and 173; also Sec. 157. It is urged in behalf of her tow that failure to carry a light as thus required did not contribute to the happening of the accident. However, that involves speculation. One cannot say whether the observance of

the light on the corners as required by the statute would or would not have changed the maneuvering of the Martin Kehoe. In the circumstances it is possible that if the master of the Kehoe had seen towage lights he would at once have stopped his engines or gone into reverse. It is also charged that the S. T. 56 should have blown a signal. I think that was not required in the circumstances which the captain of the S. T. 56 described. However, I think that there was fault in the S. T. 56 for having towed alongside a barge so loaded as to obstruct the vision of the captain of the tug, even though there was a lookout placed on the scow; James McWilliams Blue Line, Inc. v. The Prospect II, D.C., 60 F.Supp. 257; Martin Marine Transp. Co., Inc., v. Jakobson & Peterson, Inc., 2 Cir., 135 F.2d 325. Certainly during the war period maneuvers at night in crowded harbor areas should have been conducted with more than customary precaution. It is to be observed too that Brady, the so called lookout of the S. T. 56, was not at the forward end of the scow but was at a point mid-ships. See The Ariadne, 13 Wall. 475, 20 L.Ed. 542. Since both tugs were guilty of contributing causes, even though those of the S. T. 56 exceeded in number, the libellant may have a decree against both respondents.

Concurrently herewith appropriate findings of fact and conclusions of law will be filed.