**Petition of LEHIGH VALLEY R. CO. et al.**

**ERIE R. CO. v. ANCHOR LINE LIMITED.**

No. A–18316, Civil No. 8632.

United States District Court
E. D. New York.

Feb. 2, 1950.

Pyne, Lynch & Smith, New York City, proctors for petitioners (Warner Pyne, New York City, Advocate).

Hagen & Eidenbach, New York City, proctors for Erie R. Co. (Henry C. Eidenbach and David A. Kraemer, New York City, of counsel).

Reid, Cunningham & Freehill, New York City, proctors for Anchor Line Limited (Herbert P. Reid, New York City, of counsel).

BYERS, District Judge.

The Anchor Line M/V Eucadia while proceeding down the North River from an anchorage near the George Washington Bridge, bound for Bush Terminal, Brooklyn, veered sharply to her left when about opposite Pier 25 and struck the lower corner of Pier 21 N.R., causing damage to the Pier and cargo there being held. This was on September 24, 1946, at about 6:36 A.M. Daylight Time, or 9 minutes before sunrise.

As a result, the lessee of the Pier, Erie Railroad Company, filed a Civil suit in the Southern District on March 6, 1947, against the Anchor Line to recover its damages so occasioned, alleging its liability to the City of New York to make necessary repairs to the Pier. After answer had been filed and the cause was at issue, it appeared that the limitation proceeding (A-18316) had been started in this Court by petition filed March 10, 1947, reciting a collision between the Lehigh Valley tow later to be described, and The Eucadia, immediately preceding the said striking of the Pier, and the threat of claims against the petitioner in connection with these events, and the customary relief was sought. Upon that showing, the Civil cause was transferred to this district by order dated October 14, 1947 "to be tried together" with the limitation proceeding.

That has been the course followed, and one opinion will dispose of both suits, which will result in a judgment in the Civil case and a decree in the Admiralty cause.

The controversy has narrowed itself down so as to require decision of but few issues of fact.

The ship's handling is shown by the testimony of her Master, the pilot who was navigating her, the chief officer who was on the forecastle head, and a cadet stationed there as lookout.

The Eucadia is a single screw motor vessel of 7250 gross tonnage, 497 feet overall in length, 64.2 feet in beam, and of 28.8 feet moulded depth, H.P. 7000, which give her a high speed at sea of 16 knots.

On this morning the ship was drawing 21′ 5″ forward and 23′ 5″ aft, i. e., she was "practically light".

The physical conditions which prevailed are not in dispute, namely, the tide was first of the flood and in the vicinity of Pier 21 at 6:40 A.M. the movement was of a strength of 0.5 M.P.H.

The weather was clear, and under conditions of customary autumnal haze, visibility was about one-half mile on the river. Neither wind nor sea was sufficient to affect the movements of the vessels involved; all were carrying proper lights which were showing.

The times will be stated herein according to Daylight Time.

The ship was proceeding to the east of the center line of the river, which is 3338 feet wide, measured between Pier ends in this vicinity; that is, she was about 1000 feet off the Manhattan Piers from about 23rd Street.

There was a light collision between the ship and the Lehigh Valley tow about off the slip between Piers 21 and 22, namely, a bow corner of the car-float No. 1205, carrying 8 railroad cars, struck the starboard side of the ship near hatch No. 2, requiring the fairing of 3 side plates.

That tow was made up at the Lehigh freight yard in Jersey City at 6:00 A.M., as follows: The steamtug Cornell owned by the Lehigh, which is about 100 feet overall, by 25.2 feet in beam, built of wood, and of 700 H.P., took the steel carfloat L.V. 1205, carrying eight railroad cars, in tow on the tug's starboard side. The float is 262 feet overall, and her beam is 37′ 7″; there is a center canopy or "umbrella" between her two tracks each of which held four cars centrally placed. As made up, the bow of the float extended some 150 feet forward of the bow of the tug, and the stern of the latter was some 10 or 12 feet forward of that of the float.

The make-up of the tow, and the power of the tug are not criticized. Departure from the Lehigh yards for Pier 38 N.R. was had at 6:20 A.M. and the course was diagonal toward the Manhattan side. The tug's Captain says he headed for about Pier 13, and when about 800 or 900 feet off, he turned up river toward his destination.

It is argued for The Eucadia that the actual course must have been nearer to a direct line to Pier 38, although no direct evidence is offered to that effect. Since the tow was placed by the neutral witness Mitchell (who was then operating a Coast Guard tug) at roughly 600 feet off Pier ends in the vicinity of Piers 15 to 18, it is thought that the tow's heading was substantially as Hansen states it, as she proceeded diagonally across the river.

Mitchell impressed me as a reliable person who was not without training in the taking of observations. Kenny, the floatman, also made a favorable impression as a witness, and his testimony, which generally corroborates Hansen's, was that of a man who seemed to be honest and straightforward.

The finding will be that her heading of the tow in crossing the river was generally in the direction of Piers 13 to 15.

As the tow proceeded, her speed was between 4 and 5 miles per hour, and as she was nearing a point opposite Pier 16, the Erie ferry Tuxedo was observed at the end of the slip between Piers 19 and 20, about to emerge on her 6:30 A.M. trip to the Erie terminal on the New Jersey shore, which actually started at 6:32 A.M. The Captain of The Tuxedo observed this tow, and blew a one-blast signal, which the tug answered with one, and a port passing was had, as Hogan, the Captain of The Tuxedo describes it. Hansen says the signal meant that he was to pass under the ferry's stern, which he did. Almost at once the D., L. & W. ferry Scranton was about to come out of the slip between Piers 15 and 16, on her 6:31 departure for the Hoboken terminal of that railroad. Two-whistle signals were then exchanged between The Cornell and The Scranton (the former blowing first), thereby arranging that the ferry should pass under the stern of the tow, and this was accomplished without incident. The mate of The Scranton testified that the tow was then about 800 feet off the New York shore, and that the tow was proceeding diagonal-

ly across the river. These witnesses effectually place the tow generally opposite Pier 15, on a diagonal heading, and as it passed astern of The Tuxedo which was bound as stated across the river, it is not important to find just when it was that the turn was made to the north, but it must have been in effect by the time when The Tuxedo was cleared.

The tug's two-blast signal to The Scranton is of importance, and since it is shown to have been replied to with two by that ferry (Gutheil, Mate on The Scranton), there can be no doubt that there was such an exchange. Which of those two signals was heard and observed on the bridge of The Eucadia, it is not possible to state. Such a signal was heard and interpreted on the ship as being addressed to her, but the reasoning to support that opinion, if there was any, was not laid bare by either the pilot or the Master. However, the two ferries *were* seen, and their movements as above stated are in accord with The Eucadia's observations.

Recurring now to the tug Cornell, it is her testimony that, when she was about off Piers 13 and 14 (being still crossing the river, I think, but about to turn northerly) the Captain saw, and the floatman reported, The Eucadia generally in the vicinity of Pier 38, showing her mast and port lights, and that she was then further out in the river than the tug. Promptly the incident of The Tuxedo's one-blast signal ensued, which the tug answered as stated, and at once stopped her engines and turned her helm a little to starboard to pass under the ferry's stern. Clearing the latter, the tug went ahead at half-speed under one bell (about 1½ M.P.H.), and while at about the level of the Erie Piers 21 and 22, and after passing ahead of The Scranton, observed The Eucadia further out in the river than the tow, heading down toward the latter; she was still showing only her red light according to Hansen. The latter at once blew one blast, for a port passing, but there was no answer from the ship, which then started to veer sharply to her own port. Hansen places the intervening distance as between one and two float lengths (260 to 520 feet),

the tow being generally opposite Pier 21. It was at this time that the ship blew a two-blast signal to the tug for a starboard passing, as both sides agree, the dispute being as to the relative positions of the vessels. Hansen says in effect, that the ship was bearing down upon him at such a speed that he could not comply with the two-blast request (which the ship considered a direction) and at once blew an alarm.

As to that, the Mate of The Scranton heard it and looked up to see the cause; I am satisfied that the alarm was blown by the tug, and incidentally that none was ever blown by the ship.

Then the engines of the tug were put full astern and she blew three whistles so to indicate. The Eucadia then went sharp to port, under a hard left wheel, and moving toward Pier 21, brought her starboard side, near her No. 2 hatch as stated, into contact with a bow corner of the carfloat. Then she continued on and struck the southerly corner of Pier 21 as already related.

The ship's version of the episode is that she first saw the tow as it passed clear of The Tuxedo, the tug showing her port light; that the tug blew two whistles to the ship to announce that she would pass to starboard which, according to her story of the tug's heading, means that, being the holding-on vessel in a crossing situation, the tug yielded her rights to the burdened vessel, and was thereby required to promptly change her course to her own port hand, which The Eucadia expected her to do, since the latter says she blew a two-blast acceptance; that upon observing the tug's failure so to proceed, the navigator of the ship decided to try to pass ahead of the tow, first veering 5° to port and then under a hard port rudder, with full speed ahead. That the failure of the tow to navigate as the ship expected her to, caused the latter to run into the Pier, which she chose to do rather than risk sinking the tow by putting into effect a starboard helm movement. That the striking of the Pier was in part due to the impetus imparted to the ship by the blow that was struck to her starboard side near the No. 2 hatch, by the carfloat.

It should be said that the ship, after going ahead full speed, put her engines into reverse, and dropped two anchors, but could not thereby arrest her forward movement, and so struck the Pier.

The initial requirement of an examination of this explanation will be seen to involve the tug's two-blast signal above recited. The finding is that none was addressed by the tug to The Eucadia, for reasons which have been explained, but to The Scranton.

The ship's misapprehension on this subject is without justification as the evidence is presently understood, for the reason that the ferry Tuxedo crossed ahead of The Eucadia at about two ship's lengths or 1000 feet or more, and was clearly seen. Thomson on the forecastle head did not report The Tuxedo to the bridge "as I knew that the bridge had already seen that all right, I didn't reckon there was any necessity to report that, she was crossing over and she was over past the line of collision". Whatever his gifts of divination were, they did not include knowledge of how the bridge would interpret the signal which he then described: "Just shortly before the stern of the ferry had cleared this red light (of the tug) to show it to me, there had been a two whistle signal *from that direction.*" (Italics supplied.)

Hogan, the Captain of The Tuxedo, had blown such a signal to the ship, thus: "Gazing upstream in the vicinity of Pier 28 or 29, I noticed the mast lights of a ship, and the port light, and I immediately blew two blasts to pass this ship on its starboard side, which was answered, but very faint." If this estimate is approximately correct, the ship was about 1500 feet away from the ferry and nearer to that vessel than to the tug, and it was probably The Tuxedo's two blasts that were answered by The Eucadia, and not those of the tug.

The Erie's witnesses are criticized by The Eucadia as being interested, but if that were true, to which I do not agree in the least, they are no more interested than those who were called for the ship. Sinclair, her Master, asserts that there were no signals exchanged with either ferry (there would be no reason to signal to The Scranton) "Definitely not". The pilot's testimony was of negligible value.

Without selecting one of these conflicting versions, for the purpose of a finding, it is at least apparent that the decision of The Eucadia to attribute the two-blast signal to the tug was at best hasty and ill-considered, in view of the known presence of the two ferries. Since The Eucadia puts the tow on a crossing course as to two ferryboats, which latter vessels it could and did see, her Master advanced no reason whatever for concluding that those vessels would navigate with reference to the tow which he saw crossing the wake of The Tuxedo, without the interchange of whistle signals. We know that such were indeed sounded, and if Sinclair or the pilot chose to handle the ship at the speed which was shown, in these waters, he or they were capricious and imprudent in assuming that a two-whistle blast which came "from that direction", namely, the direction of the vessels in question, was directed to the ship. The more so because of what they say that signal meant to them. I can think of no reason to discredit Hogan as a witness. All that I could observe of his entire testimony was persuasive.

Nor do I believe that, when The Eucadia admits seeing the tug and float, the latter were heading for the New York Piers so as to fetch up at Pier 38. The testimony of other witnesses places the tow generally off Pier 21 at the collision. I think the 5° port rudder was ordered on The Eucadia to insure her own clearance astern of The Tuxedo, and that such change in her course tended to put the tow broader on the ship's starboard bow than when Thomson first saw her. Nor do I think the intention attributed to her by a signal which she did not give to the ship, is convincing.

The plain indications of the situation as it was when the tug blew the one-whistle signal to the ship, were for a port passing.

If the vessels were not head and head, they were nearly so, and the ship was outside of the tow by at least 100 feet; why it should be thought that a starboard pass-

ing was in order, is not apparent to me. Even if the ship were right as to the apparent crossing situation, which means that I have failed to understand the true evidence, it is still difficult to see why the tug should offer to surrender her rights in a starboard hand situation. I regard this argument for The Eucadia as a synthetic product; an ex-post-facto form of rationalization undertaken in the hope of diverting attention from the impulsive and ill-considered navigation of the ship which was dictated by the speed at which she was moving through waters known to be frequented by ferryboats and other harbor navigation.

The conventionally superior attitude of deep-sea navigators toward harbor craft is easier to observe than to describe. It was present, I am satisfied, in this case, in spite of the fact that this ship was merely bound for South Brooklyn.

The navigation of The Eucadia on her own showing was down the east side of the river rather than near the center, at full speed from 6:08 to 6:30½. The Captain said that, by understanding with the chief engineer, full harbor speed was at 95 revolutions, while full sea speed was at about 116 revolutions, but the chief engineer was not on duty, and whether that understanding had been relayed to the assistant engineer, who had charge of the engines, does not appear.

The critical times and orders, according to the bell book in the engine-room, were:

| | |
|---|---|
| 6:30½ | half ahead |
| " | slow " |
| 6:31½ | half " |
| 6:34 | " " |
| 6:35 | full " |
| " | " astern |
| 6:35½ | " " |
| 6:37 | ("Bump felt", i. e., striking Pier) |

The time which elapsed between 5:58 when she straightened out from anchorage at half ahead, and the striking of the car-float at 6:35½, was about 37 minutes. It will be remembered that her engines were put into full ahead at 6:08. The distance traveled was 7.7 nautical miles according to

Sinclair's computation made from the Chart, which shows her average speed to have been in excess of 12 knots. Therefore, between 6:08 and 6:30½, her full speed was evidently higher than the average as stated.

The attitude of mind of the Master is shown in his testimony when, after saying that the ferries obscured his vision for a substantial part of the five minutes between 6:30½, the half ahead reduction from full speed, to 6:35½ when the float was struck, he said: "Q. Why didn't you stop your engines, if the brilliance of the ferryboats was obscuring your vision down the river? A. We slowed down. That is enough. That is the ordinary practice of seamen, to slow down. You can't stop for every ship to cross. Why did he cross on our bow? He was taking a chance with us going at a terrific speed."

The speed of the tow has been indicated as the result of her exchange of whistles with the Erie ferry, and it was not "terrific" if it was to that speed which Sinclair alluded. If he meant his own, while it was scarcely terrific, it was too great speed in the circumstances. The deceleration from full speed to half ahead (70 revolutions) and then to slow ahead (50 revolutions) and then to half ahead (6:31½) as shown by the bell book, tell us nothing of the actual reduction in movement of the ship through the water, in the four and one-half minute interval between 6:30½ and 6:35, and no one has attempted to testify on the subject. We do know that the full astern movement at 6:35½, plus the dropping of anchors, did not prevent such a heavy striking of the Pier as to wreak substantial damage upon it.

 In my opinion, what happened was that when the tow was made out from the bridge of the ship, which was about 250 feet aft of the forecastle head, the ship was changing her heading by five degrees to her own port, and it was decided after too brief observation and reflection, that it would be more convenient to forge forward under a hard left rudder, and pass ahead of the oncoming tow, than to stop and reverse engines, and then to proceed under

a starboard helm, to effect a port passing, which was the proper one under the circumstances. That decision was not made *in extremis,* for The Tuxedo was about 1000 feet or more ahead at the time. It is not to be condoned by anything revealed in the evidence, but its unfortunate consequences must be visited exclusively upon the owner of the ship.

In the limitation proceeding, the petitioner is entitled to a decree of exoneration with costs (Martin Marine Transp. Co., Inc., v. Jakobson & Peterson, Inc., 2 Cir., 135 F.2d 325), and the Civil suit will result in a judgment with costs in favor of the plaintiff, with reference to a Master to take and state the account of the plaintiff's damages and to report the same to the Court according to the use and practice in the Admiralty.

Settle decree and judgment separately on notice.

Findings are filed herewith.