222 F.2d 75
 The ANGLO-SAXON PETROLEUM CO., LTD. OF LONDON, ENGLAND, owner of M/S Goldshell, Libellant-Appellee,
v.
UNITED STATES of America, Respondent-Appellant.
UNITED STATES of America, as owner of THE S.S. WHITE PLAINS, Cross-Libellant-Appellant,
v.
THE M/S GOLDSHELL, HER ENGINES, BOILERS, TACKLE, ETC., Cross-Respondent-Appellee.
 No. 238.
 Docket 22425.
 United States Court of Appeals Second Circuit.
 Argued April 5, 1955.
 Decided April 27, 1955.
 Rehearing Denied June 17, 1955.
 
 See 224 F.2d 86.
 Ruth Kearney, J. Edward Lumbard, U. S. Atty., New York City (Louis E. Greco, New York City, on the brief), for appellant.
 Herbert P. Reid, New York City, for appellee.
 Before HAND, SWAN and HINCKS, Circuit Judges.
 HAND, Circuit Judge.
 
 
 1
 This is an appeal by the United States from an interlocutory decree in the admiralty that consolidated a suit by the Anglo-Saxon Petroleum Company against the United States with a cross-suit by the United States, and held the United States solely at fault. The occasion was a collision in a fog on December 10, 1942, between two tankers, the Petroleum Company's, "Goldshell," and the "White Plains," owned by the United States. The "White Plains" had been lying at Pier 62 in the North River, had backed from her berth, and with the help of tugs had swung about and was headed south, bound out. The "Goldshell," bound in, left Stapleton early that morning and was on her way upstream. Both vessels were in ballast and each had a "Sandy Hook pilot" on the bridge in charge. The collision was off Pier 22 in the North River at 7:33 A.M. in a fog so thick at the time that the visibility was in the neighborhood of only about 500 feet. Judge Conger found that it took place "well on the wrong side of the river," by which he meant well to the east of mid-channel, probably about 500 feet from the pier ends; but, as we think the place of the collision was irrelevant, we shall disregard the challenge of the "White Plains" to this finding and, arguendo, assume that it was correct. The vessels came together at an angle, the "White Plains" showing her green light to the "Goldshell" and the "Goldshell" her red light to the "White Plains." The "Goldshell" was blowing regulation fog whistle; the "White Plains" was not, though she did sound a signal to a passing car float, which the "Goldshell" heard "on a bearing off the `Goldshell's' port bow" when the "Goldshell" was "at about the place where the collision occurred." The "White Plains's" masthead light had been out for sixteen minutes before the collision, and the outlook from her bridge "was seriously restricted by certain cargo which was loaded on the forward deck and by the gun tub on the forecastle head." As soon as the "Goldshell" heard the "White Plains's" blast she stopped her engines, when she saw the "White Plains's" green light she put them half speed astern, and she followed this with full speed astern "shortly" before the vessels came together. The "White Plains" did nothing until she saw the "Goldshell's" red light when she backed full speed astern. Her pilot did not hear the "Goldshell's" fog signals.
 
 
 2
 Judge Conger did not charge the "White Plains" because of her fault in failing to show her masthead light, or because the outlook from the bridge was restricted, for he thought that neither of these had any part in bringing about the collision. Nor did he charge her for her failure "to sound regulation fog signals" because this he held to have "in no way contributed to the collision, because her single blast to the carfloat served the same purpose by telling him" — the "Goldshell" — "that there was a vessel in the vicinity." He also found that neither vessel "was operating at a speed that was excessive under the circumstances." Thus he found the "Goldshell" without fault, and he charged the "White Plains" with fault only because, as we have said, she "was proceeding south, well on the wrong side of the river in a dense fog," for, although at Pier 22 the North River is not a narrow channel, he held that notwithstanding this, prudent navigation required ships to keep to the right in a fog. The testimony as to that was the following. The pilot of the "White Plains" said that "the normal tendency of every pilot is to get on his side of the river. * * * I was on the wrong side of the center. * * * And the further over, the worse it would be." The second officer also said that the "White Plains" should have been "near the west, slightly to the west of the center line, possibly"; and the third officer said that it "would be the proper thing for her to do, to proceed down the Jersey side." Finally, the pilot of the "Goldshell" thought it "the general rule any place to favor the right side."
 
 
 3
 We do not regard this testimony as adequate to establish an imperative duty upon ships to keep to the right in this part of the North River. There may be customs that release a vessel from the statutory duty to keep to the right in a narrow channel — there is one for Hell Gate. Moreover, there is no reason a priori why a custom should not impose a duty, if a custom may release from one; Article 29, 33 U.S.C.A. § 221, in substance so declares. However, in order to give any custom the force of law there must be evidence that it is a definite, uniform and known practice,[1] and the most that can be inferred from the testimony at bar is that these witnesses thought it safer in a fog to keep to the right; they say nothing about how much it prevails as a practice. It is at once apparent that it could not contribute in the slightest to safe navigation unless it was generally followed; and, indeed, it might tend to slacken precaution generally, so far as it was not. Moreover, even if it was generally followed, it is doubtful how far it would be of much value. One of the reasons why we held the North River not to be a narrow channel[2] was because there were so many piers and so much cross river traffic, "proceeding in every conceivable direction." Perhaps a rule that a vessel moving north or south should in a fog keep to her right when there is no cross traffic would be beneficial; but we see no reason so to suppose as things were. Be that as it may, when the law declares that vessels need not keep to the right, as it does when the water is not a narrow channel, the opinions of navigators are irrelevant as to their duties, except there be in addition proof not only that the calling shares the opinion, but that it puts it in operation.
 
 
 4
 The "White Plains" was, however, guilty of at least two statutory faults: carrying no masthead light and blowing no regular fog signals; and although Judge Conger found that these played no part in the event (as we too should be disposed to think), that is hardly enough, for, once a vessel is found guilty of a breach of a statutory rule, she must, under the doctrine of The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, show "not merely that her fault might not have been one of the causes or that it probably was not, but that it could not have been." We might find it hard to hold that the "White Plains" had proved beyond any reasonable doubt that her two statutory faults did not contribute to the collision; but we prefer to base her liability upon another fault which, moreover, the "Goldshell" shared with her, for both vessels were moving too fast in the fog that existed at the time. Although Article 16, 33 U.S.C.A. § 192, only requires a vessel in a fog to "go at a moderate speed," as everybody knows, the courts have imposed a gloss upon this that "moderate speed is that at which, if the other vessel also does her duty, the vessel will be able to stop her way before they collide."[3] So far as appears, neither vessel needed the speed at which she was moving in order to keep steerage-way; and, if she chose not to anchor, as it was not unlawful to do,[4] we cannot say that she could not have reduced still further. In any event since neither did reduce to the speed that would have enabled her to conform to the law, she was in duty bound to prove that it was impracticable to do so. The fact that the rule is more honored in the breach than in the observance, merely means that people are usually willing to take chances rather than submit to the galling necessity of poking about in a fog; and, although the usual measure of the care demanded is that commonly used in the calling, that is not the inevitable standard. Common prudence is not always adequate prudence; the courts may and at times do condemn practices that are current in the business.[5]
 
 
 5
 The decree will be modified by holding both vessels at fault.
 
 
 
 Notes:
 
 
 [1]
 Chicago, M. & St. P. Ry. v. Lindeman, 8 Cir., 143 F. 946, 949; McClellan v. Pennsylvania R. Co., 2 Cir., 62 F.2d 61, 63; Bagwell v. Susman, 6 Cir., 165 F.2d 412, 416; Albert v. R. P. Farnsworth & Co., 5 Cir., 176 F.2d 198, 201
 
 
 [2]
 The Islander, 2 Cir., 152 F. 385; The No. 4, 2 Cir., 161 F. 847
 
 
 [3]
 The Nacoochee, 137 U.S. 330, 339, 11 S. Ct. 122, 34 L.Ed. 687; The Umbria, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053; The Etruria, 2 Cir., 147 F. 216, 218; The Manchioneal, 2 Cir., 243 F. 801, 805; Steffens v. United States, 2 Cir., 32 F.2d 206; The Southern Cross, 2 Cir., 93 F.2d 297; Pennsylvania R. Co. v. Central R. R. of N. J., 2 Cir., 103 F.2d 428
 
 
 [4]
 Atlantic Refining Co. v. Moller, 320 U. S. 462, 64 S.Ct. 225, 88 L.Ed. 168
 
 
 [5]
 The T. J. Hooper, 2 Cir., 60 F.2d 737, 740
 Restatement of Torts § 292 Comment b.