**MERRITT–CHAPMAN & SCOTT COR- PORATION, Appellee,**

v.

**CORNELL STEAMSHIP COMPANY,**
claimant of THE tug, LION,
**Appellant.**

**No. 134, Docket 25081.**

United States Court of Appeals
Second Circuit.

Argued Jan. 19, 20, 1959.

Decided April 7, 1959.

**538**

Edward C. Kalaidjian and Robert S. Stitt, New York City, Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for appellant.

Stephen K. Carr, New York City, for appellee.

Haight, Gardner, Poor & Havens, New York City, for libellant-appellee.

James M. Estabrook, New York City, of counsel.

Before HAND and WATERMAN, Circuit Judges, and BYERS, District Judge.

HAND, Circuit Judge.

The Cornell Steamship Company appeals from a decree in the admiralty of the District Court for the Southern District of New York, Murphy, J., presiding, holding its tug, "Lion," solely liable for a collision with an "icebreaker," constructed in the Hudson River to protect one of the abutments of the Thruway Bridge then being constructed by the libellant across the Hudson River in Tappan Zee. The "icebreaker" was at the north end of the eastern of two uncompleted abutments, and had been designed to fend off floating ice which might be carried down the river while the abutment was being built. It was constructed of upright iron "H" beams, sheathed on the outside by heavy planking, its two vertical sides beginning at opposite edges of the abutment, and meeting at a point upstream. The two abutments were 1200 feet apart, leaving open a span for the use of vessels moving up and down stream. The upright iron—"plumb"— beams were driven deep into bottom of the river and extended for a number of feet above the water. Each beam was supported by a sloping—"batter"—beam, likewise driven in the bottom, whose upper end was fastened near the top of the upright beam, serving to sustain it against collision or pressures from outside.

At the upstream ends or corners of each "icebreaker" the claimant had set red lights to warn descending vessels of the width of the span; but there had been a number of complaints that these were too dim, and the claimant had done nothing to improve their intensity. Judge Murphy found that at the time in question the light at the end of the east "icebreaker" could have been seen "at least" three quarters of a mile away— say 1300 yards—though Barton, the "Lion's" master, estimated their visibility at only about a third as much. A Regulation of the Coast Guard (33 C.F. R., 68.10–5 & 68.10–25) required such lights to be visible "against the background lighting for a distance of 2000 yards," i. e. about a mile and a seventh.

On the night of September 16– 17, 1953, the claimant's tug, "Lion," assisted by a helper tug, "Cornell 21," was towing a flotilla of 17 scows laded with "trap rock" down stream from above Kingsland Point. The scows were in two columns of eight and nine scows on two towing cables, 75 fathoms long. The speed of the flotilla was between three, and three and a half, knots over the ground, there was northwest wind of about twenty miles an hour and an ebb tide under foot of a little less than one knot. Before the flotilla passed through the span, the helper had detached one of the end scows in order to tow her into Tarrytown. Thereafter the helper saw that the last scows were getting too close to the "icebreaker," and in order to avoid their actual contact with it began to push them to the westward so that they might clear it. She continued to push until she was herself forced to move away in order to avoid being caught with her scow between the "icebreaker" and the last scows, which scraped along the west side of the "icebreaker," as they passed. The claimant attributes the serious injury which happened to the "icebreaker" that night to some undisclosed tow that

passed through the span after the "Lion" and her flotilla, but Judge Murphy did not accept the evidence, and it was certainly not "clearly erroneous" for him to reject it. We also affirm his finding that it was the contact of the port sides of the last scows that did the damage complained of in spite of the fact that these vessels themselves showed only marks of rubbing or scraping. We find no difficulty in believing that the weight of two or three tiers of two heavily laden scows side by side could push over the upright —"plumb"—beams that held the plank sheathing, even though they were supported by the "batter" beams. The contact was certainly at a very small angle, the speed of the flotilla slow, as we have said, and, so far as appears, the beams were not driven down to the rock. A contact of that kind need not have done serious injury to the scows as they slid past.

■ If this is what happened, and we accept the findings, we cannot say that it was "clearly erroneous" to find the "Lion" at fault. She was negligent because she had gone down the river before and knew about the "icebreaker" and the inadequate lighting there. Despite this knowledge she permitted herself and her tow, strong lights or weak lights, to drift too far to the east. Her master did testify that he first made out the light when only a quarter of a mile away, but Judge Murphy did not accept his estimate. We will not therefore exonerate the "Lion." On the other hand the appellant was also at fault, since its light should have been visible for 6000 feet instead of 4000, as the judge found, and it would have required action at only a short time before the "Lion" began to correct the position of the tow to avoid the accident because there was not, properly speaking, any "collision," but merely a push as the scows rubbed along the "icebreaker."

■ Ordinarily we should accept the judge's finding that the failure to set sufficient lights "did not in fact cause the accident," but a different rule applies to the breach of a statutory duty from the breach of an ordinary duty. The doctrine of The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, is that when the fault consists in the breach of a "statutory rule intended to prevent collisions * * * the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." This doctrine or its equivalent—concerning the absence of a lookout—we have applied in many decisions. The Madison, 2 Cir., 250 F. 850, 852; Martin Marine Transp. Co. v. Jakobson & Peterson, 2 Cir., 135 F.2d 325, 328; Gulf Oil Corporation v. The Socony No. 16, 2 Cir., 162 F.2d 869; Rice v. United States, 2 Cir., 168 F.2d 219; Ira S. Bushey & Sons, Inc. v. United States, 2 Cir., 172 F.2d 447; Anglo-Saxon Petroleum Co., Limited of London, England v. United States, 2 Cir., 222 F.2d 75, 77; Dwyer Oil Transport Co. v. The Edna M. Matton, 2 Cir., 255 F.2d 380, 382. It seems to us impossible to be sure beyond reasonable doubt that if the lights had been visible for 6000 feet, the "Lion" would nevertheless have failed to act in season, especially when it needed so little added time to clear the "icebreaker."

The decree will be modified to award the libellant only half damages.

BYERS, District Judge (dissenting).

I am constrained to dissent from so much of the court's opinion as sustains the finding of the District Court, that any damage sustained by the libelant's structure should be visited upon the "Lion."

It is not disputed that there was a rubbing along the "icebreaker" by two scows at the tail end of the Cornell tow, on the port side. Thus the fact of contact or collision, if that term be preferred, is accepted as a datum.

The libelant rested under the necessity also of demonstrating that the damage of which it complains, was caused thereby. That proposition is self-evident, but authority to support it is not lacking: The S. & P. No. 15, D.C., 61 F.Supp. 846, and cases therein cited. Cf. The Java, 14 Wall. 189, 20 L.Ed. 834, 81 U.S. 189.

**540**

Because the record is thought not to demonstrate that this burden of proof has been sustained, this opinion is written.

For some undisclosed reason, the libelant undertook to show that the "Lion" and her tow effected passage through the abutments at about 1:15 A.M. on September 18, 1953 instead of 12:30 A.M. which was the approximate time shown by the "Lion." As to this, the opinion of the District Court states:

> "We resolve easily enough the conflict of time between 12:30 and 1:15 because we do not accept the tug Lion's captain's estimate of his speed over the ground at the time."

Concerning this there was no opposing testimony which would constitute the foregoing a finding based upon conflicting evidence. Nor was any finding made as to what the speed was deemed to be, perhaps because of the obvious difficulty of stating a convincing computation.

The libelant's exhibit 3–A is a portion of a daily log maintained by one of its deceased employees who was a watchman on patrol. It contains the following:

> "1:30 A.M. Cornell tug Jumbo."

The hour stated is written over an erasure which could have been originally 12:30. Moreover it is immediately over, not under, the 1:00 A.M. entry and is thus not in sequential order. The entry below the 1:00 A.M. is at 2:00 A.M.

The purported 1:30 entry as now presented is obviously synthetic. The reference to the tug Jumbo can be explained by its close resemblance in appearance to the "Lion" (as stated in the testimony), and in my view, what happened was that the "Lion" and tow passed the abutment without perceptible damage to the "icebreaker" at 12:30 A.M.

The 2:40 entry recites in part,

> "Went on round and saw that the red light was out"

and the extensive nature of the damage was observed at 5:30 A.M.

The only irregular entry is the one purporting to be made at 1:30 A.M.

The times and distances and therefore the speed over the ground of the "Lion" and its tow, are well attested by the testimony of Kennelly, the captain of the helper tug, and her log entries, and by the log entries of the "Lion" when off various places above and below the location of the abutments of the bridge then under construction.

Since no reason is apparent for brushing aside Barton's testimony as to the speed of his tow, in my opinion it should have been accepted.

The nature and extent of the damage to the "icebreaker" is shown by the testimony of the surveyor Watkins. That was a sturdy structure, erected to withstand the impact of heavy ice moving down the Hudson River under conditions which are well understood, and the physical characteristics of the structure are described in the prevailing opinion.

The District Court drew the "inference" that the extensive demolition was caused by the sliding along of the scows in the "Lion" tow. That inference is not in accord with the testimony of Kennelly, who was an eye-witness of the occurrence, and is not supportable as I read the record. The wreckage was too comprehensive to have resulted from a mere rubbing or sliding along piling and sheathing.

Captain Barton emerges in a somewhat anomalous position as a witness. He was not believed as to the speed of his tow by the District Court, and that view is here sanctioned. However, this court is unanimous in finding his testimony to be credible concerning the distance at which the red light on the east abutment was visible. I go further and accept his statement as to the time his tow passed the abutment.

As to so much of the opinion of the court as discusses statutory fault on the part of libelant, and its failure to demonstrate that the fault could not have contributed to the contact, such as it was, between the tow and the "icebreaker," I concur.

From so much of the opinion as awards half damages to the libelant, I dissent, and would dismiss the libel for failure on the libelant's part to sustain its burden of proof, that the extensive damage to the "icebreaker" was caused by the "Lion" tow.