**AMERICAN EXPORT LINES, INC., as owner of the S.S. EXEMPLAR, Libelant,**

v.

**DREDGE ADMIRAL, her engines, etc., the BARGE A–244 and the Arundel Corporation, Respondent.**

**The ARUNDEL CORPORATION, as owner of the dredge Admiral and the barge A–244, Cross-Libelant,**

v.

**The S.S. EXEMPLAR, her engines, etc., and American Export Lines, Inc., Cross-Respondent.**

Nos. 61 AD. 1360, 62 AD. 746.

United States District Court
S. D. New York.

April 22, 1966.

Foley & Martin, New York City, Christopher Heckman and .Stephen J. Buckley, New York City, of counsel, for libelant.

Haight, Gardner, Poor & Havens, New York City, H. M. Walker, Jr., New York City, of counsel, for respondent.

EDELSTEIN, District Judge.

## FINDINGS OF FACT

1. This is an action by American Export Lines, Inc., owner of the S.S. EXEMPLAR, against the Arundel Corporation, owner of the dredge ADMIRAL and the barge A–244, for damage to the S.S. EXEMPLAR arising out of the collision between the EXEMPLAR and the barge A–244, which took place in the Hog Island Reach Channel of the Cooper River in the harbor of Charleston, South Carolina, on the morning of February 16, 1961. The Arundel Corporation instituted a cross suit against the S.S. EXEMPLAR and the American Export Lines arising out of the same collision. The two suits were subsequently consolidated for the purpose of trial.

2. American Export Lines, Inc., a New York corporation, was at the time of the collision the owner of the S.S. EXEMPLAR. The Arundel Corporation, a Maryland corporation, was at the time of the collision the owner of the dredge ADMIRAL and the barge A–244.

3. The EXEMPLAR, a dry cargo vessel, is 473 feet 1 inch long, 66 feet 5 inches wide, and at all relevant times was laden to a draft of 10 feet 8 inches forward and 19 feet aft. She is powered by two steam turbines geared to a single propeller shaft. The dredge ADMIRAL is a non-self-propelled suction type dredge, 150 feet in length, 40 feet wide, 11 feet deep and was built in 1911.

4. During the early morning hours of February 16, 1961, the dredge ADMIRAL was dredging pursuant to contract with the United States Army Corps of Engineers in the Hog Island Reach Channel of the Cooper River, Charleston Harbor, South Carolina. The dredge, which was facing downstream in a southerly direction, was moored approximately 1000 feet south of the Cooper River (Memorial) Bridge in the middle of the center cut of three dredging cuts, each 200 feet wide. The total width of the channel was approximately 600 feet. A pontoon pipeline, through which dredged material was sucked up and carried to the discharge or spoil area, extended 200 feet aft from the stern of the dredge ADMIRAL and then in an easterly direction to the discharge or spoil area on Hog Island, thereby constricting the easterly half of the channel.

5. The ADMIRAL had been dredging in the same vicinity for approximately one month. On the evening of February

15, 1961, the dredge captain, A. R. Grizzard, by radio-telephone, advised the pilot boat at the entrance to Charleston Harbor as to the exact location of his dredge.

6. Moored along the starboard or westward side of the dredge ADMIRAL, and separated from the dredge by a fender of approximately 14 inches, was the water barge A–244 of 127 tons, 92 feet in length, 26 feet in width, and 6 feet in depth, which was built in 1939. At all relevant times on the morning of February 16, 1961, the dredge ADMIRAL carried all required navigation lights but the water barge A–244 was not lighted as required by the Pilot Rules for Inland Waters, § 80.20(b). The dredge ADMIRAL at all relevant times had an anchor out to starboard, which was marked by an unlighted buoy afloat approximately 200 feet west of the dredge.

7. At 0424 hours on February 16, 1961, the S.S. EXEMPLAR arrived off the Charleston pilot's station to obtain the services of a pilot for the northbound trip in Charleston Harbor to the Columbus Street Terminal. At 0448 hours, on the morning of February 16, 1961, Robert Burdell, a federally licensed pilot, took the "con" while the master of the S.S. EXEMPLAR, Neil W. Christensen, remained on the navigating bridge and in over-all command of his vessel. The second officer and a qualified helmsman were also in attendance on the bridge, a lookout was stationed on the bow and the chief mate was also present on the bow to stand by the anchor in the event it had to be let go. At all relevant times the navigation lights aboard the S.S. EXEMPLAR were burning brightly.

8. At all relevant times on the morning of February 16, 1961, it was totally dark, dawn had not begun to break, but the atmosphere was clear and night visibility was good. The wind was from the northeast at approximately 4 to 6 knots, and the tidal current was flooding in a northerly direction at approximately 2 knots.

9. The S.S. EXEMPLAR passed a beam of Buoy No. 20 at 0520 hrs. and a beam of Buoy No. 25 at 0526 hrs. The distance between Buoys 20 and 25 is approximately 2940 yds. as measured on Coast and Geodetic Survey Chart No. 470, American Export's Exhibit "5" in evidence, and the EXEMPLAR was making good a speed of approximately 14.5 knots over the ground during that period of time. During the same period of time the EXEMPLAR's bell book indicates that her engines were making turns for "full maneuvering speed" (60 revolutions or approximately 12 knots). The combined effect of the flooding current and wind was to increase the EXEMPLAR's speed by approximately 2.5 knots. Shortly thereafter both the pilot and the first mate observed the lights of the dredge ADMIRAL at approximately 3 to 4 miles distance while it was still around the channel bend. There were no obstructions between the EXEMPLAR and the dredge ADMIRAL and the visual sighting was made on a line crossing Hog Island.

10. At 0535 hrs. the EXEMPLAR slowed to "half speed" (40 revolutions or approximately 8 knots).

11. At 0537 the EXEMPLAR exchanged whistle signals with the ADMIRAL whereby the dredge directed the EXEMPLAR to pass to starboard (westward of the dredge). Thereafter, the pilot, not having observed the unlighted barge or the unlighted buoy, aligned the EXEMPLAR to pass equidistant between the lighted dredge ADMIRAL and unidentifiable floating objects just outside the westward edge of the channel.

12. At 0541 the EXEMPLAR reduced speed to slow speed, (20 revolutions or approximately 4 knots), not counting the effect of wind and current.

13. The EXEMPLAR continued ahead and at approximately 0544 hours a kaleidoscope of events occurred with rapidity. The chief mate of the EXEMPLAR, stationed on the bow, reported to the bridge that he had sighted an unlighted anchor buoy just off the port bow; the message was relayed via the second mate on the bridge to the pilot and at approximately the same time a

light was sighted thrown out from the dredge in the direction of the anchor buoy; the pilot ordered right rudder to avoid the anchor buoy and at approximately the same time stopped his engines to avoid fouling the propellor in the anchor cable; about the time the bow turned to starboard the unlighted barge was first seen; the pilot ordered left rudder [1] in order to clear the now visible barge, but one effect of the left rudder, the court infers, was to pivot the EXEMPLAR's stern toward the barge. See Finding 14, infra. The starboard side of the EXEMPLAR in the vicinity of the No. 3 hatch then struck the starboard quarter portion of the barge A–244 at approximately 0545 hours; the EXEMPLAR continued to scrape along the starboard quarter portion of the barge until the aft end of the No. 5 hatch was reached when, as a result of the captain's action described in Finding No. 14, infra, the EXEMPLAR's stern portion swung clear of the A–244.

14. Immediately after contact with the barge the EXEMPLAR's captain ordered hard right rudder which had the effect of swinging the stern of the EXEMPLAR away from the barge, breaking the contact between the two vessels. The EXEMPLAR then proceeded to its destination.

■ 15. The failure to illuminate the anchor buoy in time, and the failure to provide the illlumination on the barge required by the rules were proximate causes [2] of the collision.[3]

---

1. Although not emphasized by the parties in their post trial briefs or proposed findings of fact and conclusions of law, the pilot, Robert M. Burdell, indicated in both his original written statement to the Coast Guard (Arundel Exhibit "E") and in his deposition, p. 10 (American Export Exhibit "9") (trial transcript pp. 164–65), that he came left just before the collision.

2. It was urged that the EXEMPLAR for no apparent reason took a sudden and substantial sheer to starboard during which the ship's head did not turn but rather the ship fell away bodily to starboard. This unexplained sheer, by coincidence, allegedly occurred at the very moment the EXEMPLAR was passing the barge. The pilot's order, however, of right rudder, (which was given to avoid the unlighted buoy) followed by his order of left rudder, (given in an effort to avoid the unlighted barge), in addition to the other circumstances herein described, explain the ship's movement to starboard. The court, based on its evaluation of the demeanor of the witnesses, its determination of credibility, and upon careful consideration of the facts found, rejects the unexplained mysterious sheer version of the collision.

Even assuming, however, that the EXEMPLAR did take an unexplained sheer, while she was maneuvering rapidly in an effort to avoid the unlighted buoy and unlighted barge, the outcome of this case would not be different. There was no evidence that any such sheer resulted from improper navigation on the part of the EXEMPLAR or any defect in the ship. On the contrary, except in regard to its speed, the EXEMPLAR was properly maneuvered and had no relevant equipment defects. The fact of the sheer would not, therefore, require a finding that the EXEMPLAR was at fault. Compare The Lackawanna, 210 F. 262 (2d Cir. 1913), with Maroceano Compania Naviera S.A. of Panama v. City of Los Angeles, 193 F.Supp. 529 (S.D.Cal.1961). Moreover, the sheer would not be the kind of intervening or independent cause that would insulate the Arundel Corporation from liability. It is clear that the faults attributable to the dredge ADMIRAL and her water barge set the stage for the collision by creating a serious, unreasonable, and foreseeable risk of collision. It is also clear that these faults in fact led the pilot to align his ship closer to the dredge and forced him to react more quickly than he would have but for the faults. The accident would not have occurred but for the faults of the dredge and water barge which were actual causes of the collision, notwithstanding the alleged last moment sheer. As actual causes of a collision which was well within the foreseeable risk, the neglects attributable to the dredge ADMIRAL and her water barge would be deemed proximate causes of the collision. See Petition of Kinsman Transit Co., 338 F.2d 708, 721–726 (2d Cir. 1964), cert. denied, 380 U.S. 944 (1965), and materials cited therein.

3. The EXEMPLAR urges that the dredge ADMIRAL was negligent in two other respects. The water barge, it argues, should have been moored along the port

16. Although in retrospect it may seem that the pilot may have applied more right rudder than was appropriate to avoid the unlighted buoy, thereby bringing him too close to the dredge, it should be recalled that the anchor buoy was only approximately 200 feet from the dredge and approximately 27 feet of that space was occupied by the water barge and its fender. The failure to provide timely illumination on the anchor buoy compelled the pilot to maneuver quickly in order to avoid hitting the buoy and at the same time bring the EXEMPLAR (which had a width of approximately 66 feet and a length of approximately 473 feet) through the slot of approximately 173 feet separating the anchor buoy and the just detected unlighted water barge. Under these circumstances and given the EXEMPLAR's speed, the pilot's maneuvering of the ship cannot be judged negligent.

17. The EXEMPLAR's speed at the time of the impact, and while it was within 200 feet of the dredge ADMIRAL, however, was approximately 4 knots through the water and approximately 6 to 6.5 knots over the bottom.

18. The speed of the EXEMPLAR was in violation of the Pilot Rules, 33 C.F.R. § 80.27.[4]

19. The EXEMPLAR has failed to persuade the court that its excessive speed could not have contributed to the collision.

## CONCLUSIONS OF LAW

The only significant legal issue between the parties relates to the interpretation of the Pilot Rules for Inland Waters, 33 C.F.R. Part 80, which the Arundel Corporation alleges that the EXEMPLAR violated. It urges that the EXEMPLAR's total speed over the ground (speed through the water plus the effect of wind and current) was approximately 6 to 6.5 knots at the time of the collision and therefore the EXEMPLAR was in violation of the relevant part of the Pilot Rules § 80.27; 33 C.F.R. § 80.27, which provides:

> "Vessels, with or without tows, passing floating plant [sic] working in channels, shall reduce their speed sufficiently to insure the safety of both the plant and themselves, and *when passing within 200 feet of the plant their speed shall not exceed five miles per hour.*" (Italics added.)

Moreover, Arundel urges that when the collision occurred the EXEMPLAR was in violation of a regulation designed to prevent collision, and therefore the EXEMPLAR has the burden of showing that its fault could not have contributed to the collision. The Pennsylvania, 19 Wall. 125, 136–138, 86 U.S. 125, 136–138, 22 L.Ed. 148 (1873). See, e. g., Diesel Tanker F. A. Verdon, Inc. v. Stakeboat No. 2, 340 F.2d 465, 467–468 (2d Cir. 1965); Merritt-Chapman & Scott Corp. v. Cornell S.S. Co., 265 F.2d 537, 539 (2d Cir. 1959). The EXEMPLAR, on the other hand, contends that the purpose of the enabling act under which the regulation in question was promulgated was the prevention of damage to improved waterways by excessive wash from passing vessels. Therefore, it reasons, the regulation's requirement of five miles per hour should be construed as referring to speed through the water, not speed over the ground. The EXEMPLAR's speed through the water was only about four knots and therefore, it is argued, not in violation of the Pilot Rules.

---

(or eastward) side of the dredge during the daytime. Sufficient evidence has not been introduced, however, to persuade the court that the dredge ADMIRAL was negligent by merely mooring the barge on its starboard side during hours of darkness.

In view of the faults found against the dredge ADMIRAL and the barge A-244, it is unnecessary for the court to decide whether the dredge was also required to have a lookout with no other duties assigned as would normally be required of a vessel under way. See Article 29, Inland Rules of the Road; 33 U.S.C. § 221 (1964).

The court has not been persuaded that the EXEMPLAR's lookout was negligent.

4. See Conclusions of Law, infra.

Moreover, even if a speed violation were found, the statute's purpose of preventing wash damage (rather than preventing collisions) would make inapplicable the rule of The Pennsylvania. The EXEMPLAR urges that the statutory purpose

"[I]s apparent in the legislative history appearing in the Congressional Record. * * * [of] [t]he enabling legislation of this regulation * * * found in 32 Stats., 374 § 11, 57th Cong., 1st Session, 1902. * * *"
Post trial brief for libelants at 21.

Although a statement in the Congressional Record, from which the EXEMPLAR's brief thereafter quotes supports its argument, the brief fails to mention that the statutory provision expressly authorizing the Secretary of War to promulgate speed regulations in harbors to which that statement referred, was in fact omitted when the statute was subsequently amended in 1917. See 40 Stat. 266 § 7, 33 U.S.C. § 1 (1964). More importantly the cited statute, as amended in 1917,[5] was the authorizing act for the regulation promulgated by the Department of the Army, now contained in 33 C.F.R. § 201.11, which is not applicable in Charleston Harbor.[6] The regulation that the EXEMPLAR did allegedly violate, is found in the Pilot Rules for Inland Waters, 33 C.F.R. § 80.27, and that regulation is promulgated by the Coast Guard Commandant.[7] Although identical in language to the regulation promulgated by the Army Corps of Engineers, the statutory authority for this Coast Guard regulation is derived from 30 Stat. 102 § 2, as amended, 33 U.S.C. § 157 (1964). See 29 F.R. 18011 (December 18, 1964); Note accompanying 33 C.F.R. Part 80 (Supp. 1965). The introductory section of the relevant enabling act[8] provided:

"That the following regulations *for preventing collisions* shall be followed by all vessels * * *." 30 Stat. 96. (Italics added.)

5. Both the statute cited by the EXEMPLAR (32 Stat. 374 § 11) and its 1917 amendment were part of general appropriations bills for rivers and harbors and were both amendments to § 4 of the River and Harbor Act of August 18, 1894. The legislative reports related to the 1917 amendment contain no explanation for the deletion of the language expressly authorizing the Secretary of War to promulgate speed regulations. See H.Rep. No. 46, 65th Cong., 1st Sess. (1917); S.Rep. No. 81, 65th Cong., 1st Sess. (1917); conference report, designated H.Rep. No. 116, 65th Cong., 1st Sess. (1917). Such regulations have neverless been promulgated subsequent to the 1917 amendment, at least since 1938, see 33 C.F.R. § 201.9 (1st ed. 1938) and perhaps since 1928, see source note accompanying 33 C.F.R. § 201.1 (1st ed. 1938).

6. The Department of the Army regulation presently found in 33 C.F.R. § 201.11 applies to the Great Lakes and certain "Western Rivers." 33 C.F.R. § 201.1(b). Authority for the promulgation of such regulations, at least as to the western rivers, was apparently withdrawn from the Department of the Army by Congress in 1958, and transferred to the Secretary of the Treasury. See H.Rep. 2292, 85th Cong., 2nd Sess.1958, reprinted in 2 U.S.

Code Congressional and Administrative News pp. 3547, 3550 (1958). In any event it is clear that the Coast Guard regulation was intended to apply to the Cooper River Channel in Charleston Harbor. Compare 33 C.F.R. § 80.01, with 33 C.F.R. 201.1(b). See generally 33 U.S.C. § 2.63–5 (1964).

7. The Secretary of the Treasury has delegated his authority to the Commandant of the Coast Guard. See Treasury Dept. Order 167–33, 23 F.R. 7592 (Sept. 29, 1958). Public Law 85–656 (72 Stat. 612–613), cited in Treasury Dept. Order 167–33, is the recent amended version of the original enabling act, 30 Stat. 102 § 2. See note 8 infra.

8. An argument could have been made that the Secretary of the Treasury (and therefore the Commandant of the Coast Guard) had no authority to promulgate the speed regulation in question. The original enabling act authorized the establishment of

"*rules to be observed by steam vessels in passing each other* and as to the lights to be carried by ferry-boats and by barges and canal boats when in tow * * *." 30 Stat. 102 § 2 (1897) (italics added.)

A "steam-vessel" was defined (and substantially is still defined) as "any ves-

The legislative history makes it clear that a prime purpose of the act was to integrate, to the greatest extent possible, the Inland Rules with the then recently

sel propelled by machinery." 30 Stat. 96 (1897). A non-self-propelled or stationary dredge of the dredge ADMIRAL type is not within the definition of "steam vessel" nor within any of the other classifications (ferryboats, barges and canal boats when in tow) for which authority to regulate lights was issued. The attention of the House of Representatives was called to the inability to regulate the lights carried by such non-self-propelled vessels laying submarine aqueduct pipes in New York harbor. See H.Rep. No. 599, 63rd Cong., 2d Sess. 1–2 (1914). A bill (S. 5289) designed to fill the gap relating to lights on dredges and also to provide for the regulation of day signals as well as lights, see H.R.Rep. No. 599, supra, was enacted into law (Public Law No. 107, 38 Stat. 381 (1914)) and provided, *inter alia*, authority to promulgate regulations:

> "as to the *lights and day signals* to be carried by vessels, *dredges of all types*, and vessels working on wrecks by other obstruction to navigation or moored for submarine operations * * *." 38 Stat. 381 (1914) (italics added.)

The statute clearly authorized the promulgation of regulations relating to day and night signals in the form of lights, but gave no authority for speed regulations except the previously existing authority relating to "steam vessels in passing each other." Ibid. Amendments in 1932 and 1936 merely transferred regulatory authority to the newly created Bureau of Navigation and Steamboat Inspection and later to the Bureau of Marine Inspection and Navigation. See 47 Stat. 415 (1932); 49 Stat. 1380 (1936). In 1938 the "Pilot Rules for Inland Waters" were promulgated by the Bureau of Marine Inspection and Navigation. 33 C.F.R. Chapter III, Part 312 (First ed. 1938). These Pilot Rules were issued pursuant to the original enabling act of 1897 (30 Stat. 102) as amended in 1914 (38 Stat. 381). See note accompanying 33 C.F.R. § 312.01 (First ed. 1938). The regulation allegedly violated by the EXEMPLAR was included in these original Pilot Rules, 33 C.F.R. § 312.26 (First ed. 1938), and is similar in all relevant respects to the present regulation. Statutory authority for 33 C.F.R. § 312.26 (First ed. 1938) was cross referenced within the code to 33 C.F.R. § 312.01 (First ed. 1938), which in turn referred back to the 1897 statute as amended in 1914, even though that stat-

ute apparently authorized only regulations relating to lights and day signals. The source of 33 C.F.R. § 312.26 was given as a rule adopted by the Board of Supervising Inspectors and approved by the Secretary of Commerce in 1938. See note accompanying 33 C.F.R. § 312.14 (First ed. 1938). (The court's research has been unable to further determine the geneology of the particular regulation in question.) Thus, had the question been raised in 1938, a strong argument might have been made that the speed regulation in question was beyond the scope of the granted statutory authority and therefore invalid. Subsequent, however, to the regulation's promulgation in 1938, Congress has had occasion to review and amend the enabling act. The functions of the Commerce Department, insofar as is relevant, were transferred to the Commandant of the Coast Guard in Reorganization Act of 1946, 60 Stat. 1097 (1946). In 1948 the geographical area to which the Inland Pilot Rules applied was extended and it was provided that the Commandant of the Coast Guard

> "shall establish such rules to be observed on the waters mentioned in the preceding section by steam vessels in passing each other and as to the lights to be carried on such waters by ferryboats and by vessels and craft of all types when in tow of steam vessels, or operating by hand power or horsepower or drifting with the current, and any other vessels not otherwise provided for * * *." 62 Stat. 249, § 3 (1948).

The principal purpose of the 1948 amendment, however, was to extend the Inland Water Rules to certain of the western rivers previously covered by rules otherwise promulgated. The Senate Report contains no explanation for the language changes relating to the authority to promulgate regulations. See S.Rep. No. 1215, 80th Cong., 2nd Sess. (1948), U.S. Code Cong.Serv.1948, p. 1562. Although the phrase "any other vessel not otherwise provided for" would certainly be broad enough to cover all classes of vessels, there is no indication that this language was intended to relate to anything except the authority to promulgate regulations relating to "steam vessels in passing each other" and "the lights to be carried on such waters." It would appear, however, that the drafting of the 1948 amendment was less precise than might have been hoped. When the stat-

adopted International Rules of the Road for the Prevention of Collisions on the High Seas. See S.Rep. No. 107, 55th Cong. 1st Sess. 1–3 (1897). The present version of the relevant enabling act contains the language similar to that found in the original statute:

"The following regulations *for preventing collisions* shall be followed by all vessels * * *." 33 U.S.C. § 154 (1964). (Italics added.)

The regulation in question provides in part that vessels passing a floating plant shall reduce speed

"sufficiently to *insure the safety of both the plant and themselves.* * *" 33 C.F.R. § 80.27. (Italics added.)

██ The court finds that the regulation violated by the S.S. EXEMPLAR

was promulgated for the purpose of preventing collisions pursuant to enabling legislation intended for the prevention of collisions. The rule of The Pennsylvania case is applicable.[9]

If both vessels were in motion, speed through the water would be relevant [10] to avoiding collision since the current would affect both vessels in a similar manner. Griffin, The American Law of Collision, 582 (1949). See The Bilbster, 6 F.2d 954, 956 (2d Cir. 1925). Nevertheless,

"[I]f one of them is at anchor and therefore unaffected by the current, while the other is navigating, the latter's speed *over the ground* is the important thing." Griffin, op. cit. supra. (Italics in the original.)

---

ute was again amended in 1958 transferring the authority of the Commandant of the Coast Guard to the Secretary of the Treasury, 72 Stat. 612 (1958), the statute was also amended to add the phrase "and day signals" because the 1948 statute which authorized regulations relating to "lights" had "inadvertently omitted" reference to day signals, H.Rep. No. 2292, 85th Cong., 2nd Sess. (1958), reprinted in 2 U.S.Code Congressional and Administrative News pp. 3547, 3549 (1958), an authority previously granted in the 1914 amendment.

Whether the amending and reenactment of the statute subsequent to 1938 indicates that Congress approved of the regulation or whether it had been otherwise authorized, need not be decided. The parties have neither briefed nor argued the validity of the regulation. They have both assumed its validity. Thus the issue has not been "presented" by the parties, see 5 U.S.C. § 1009(a) (1964). In any case, a regulation is ordinarily presumed valid and a party seeking to attack it has the burden of persuading the court that it is invalid. New York Foreign Freight Forwarders & Brokers Ass'n., Inc. v. Federal Maritime Commission, 337 F.2d 289, 294–295 (2d Cir. 1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965); United States v. Obermeier, 186 F.2d 243, 246–250 (2d Cir. 1950), cert. denied, 340 U.S. 951, 71 S.Ct. 569, 95 L.Ed. 685 (1951). See American Trucking Ass'ns., Inc. v. United States, 344 U.S. 298, 308–313, 73 S.Ct. 307, 97 L.Ed. 337 (1953). The EX-

EMPLAR has not met that burden in the instant case.

9. Both parties have assumed, and the court agrees, that the rule of The Pennsylvania case is applicable to a regulation as well as a statutory rule if the regulation is valid and "intended to prevent collision. * * *" The Pennsylvania, 19 Wall. 125, 126, 86 U.S. 125, 136 (1873). See Merritt-Chapman & Scott Corp. v. Cornell S.S. Co., 265 F.2d 537 (2d Cir. 1959).

The relationship to the collision of the EXEMPLAR's statutory fault is not so "speculative" or "improbable" that the rule of the Pennsylvania case would be inapplicable. See Seaboard Tug & Barge, Inc. v. Rederi ABDISA, 213 F.2d 772, 774–775 and n. 3 (1st Cir. 1954). And there is no evidence to support the EXEMPLAR's implied argument that the vessel could not have been properly navigated at or below the statutory speed. See trial transcript pp. 98–99.

10. In fog, a ship with moderate speed over the ground but excessive speed through the water may, of course, be held liable, see The Yarmouth, 100 F. 667, 670–672 (D.Mass.1900), when colliding with another moving vessel. But concern for excessive speed of any sort, in fog, is so great that a ship with no speed through the water (lying still in the water) may still be held liable for its excessive speed over the ground. See Chesapeake & Delaware Steamboat Co. v. Tug Pennsylvania, 1934 Am.Mar.Cas. 569 (2d Cir.), cert. denied, 293 U.S. 575, 55 S.Ct. 86, 79 L.Ed. 673 (1934).

The rule in England is precisely the same.

"As regards danger to vessels at anchor, the speed of the other ship over the ground, and not through the water, is that which must be considered; and in such cases the strength and direction of the tide [or current] must be taken into account. * * *" Marsden, Collisions at Sea, ¶ 772 at 527, (McGuffie 11th ed. 1961) published in 4 British Shipping Laws (Stevens & Sons, Ltd. 1961).

The relevant speed in this case, therefore, is speed over the ground.[11]

Based on its Findings of Fact and its analysis of the law the court draws the following conclusions:

1. This court has jurisdiction over the parties and the subject matter of these actions.

2. The dredge ADMIRAL failed to provide timely illumination of its anchor marker buoy required by the Pilot Rules for Inland Waters § 80.29. This fault was a proximate cause of the collision.

3. The water barge A–244, a form of scow, failed to exhibit the lights required by the Pilot Rules for Inland Waters § 80.20(b). This fault was a proximate cause of the collision.

▮ 4. The speed of the S.S. EXEMPLAR was in excess of five miles per hour when it approached within 200 feet of the dredge ADMIRAL. Its speed thereby violated the Pilot Rules for Inland Waters § 80.27. The EXEMPLAR has failed to persuade the court that this excessive speed could not have been a proximate cause of the collision.

▮ 5. Both vessels were at fault, therefore the damages must be totaled and each vessel shall bear half the total loss.

Submit decree on ten days notice, but in any event, within twenty days.

So ordered.

---

11. Nautical miles per hour are normally expressed as "knots." See Bowditch, American Practical Navigator (U.S. Navy Hydrographic Office) 66 (1962). The instant regulation, however, uses the phrase "miles per hour." Thus it might have been argued that the phrase "miles per hour" appearing in a nautical regulation suggested that the intended standard was statutory miles as opposed to nautical miles. Indeed the leading text on navigation states that:

"The land or statute mile * * * of 5,280 feet is commonly used for navigation on rivers and lakes, notably the Great Lakes of North America." Bowditch, op. cit. supra at 65.

This issue need not be resolved, however, because its resolution could in no event aid the EXEMPLAR. The international nautical mile, approximately 6,076.1 feet, ibid., is about 1.15 times greater than the statute mile of 5,280 feet, ibid. If the apparently intended statutory mile standard were applied the EXEMPLAR's speed over the bottom would be increased approximately 1.15 times, thus aggravating its violation of a speed regulation designed to prevent collisions.